**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| LINDA HUNT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:10-cv-376-PRC |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Linda Hunt on

September 23, 2010, and Plaintiff's Memorandum in Support of Her Motion for Summary Judgment

[DE 18], filed by Plaintiff on February 14, 2011.  Plaintiff requests that the January 27, 2010,

decision of the Administrative Law Judge to deny her disability insurance benefits be reversed or,

alternatively, remanded for further proceedings.  For the following reasons, the Court grants

Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On September 20, 2007, Plaintiff filed an application for Supplemental Security Income

alleging a disability onset date of June 1, 2007.  Plaintiff's application was denied initially and upon

reconsideration.

A hearing was held on December 30, 2009, before Administrative Law Judge Sherry

Thompson, at which Plaintiff, her attorney, and a vocational expert appeared.  On January 27, 2010,

the ALJ issued a decision denying Plaintiff's application.  Plaintiff sought review of the ALJ's

decision and the Appeals Council denied thE request on August 10, 2010, leaving the ALJ's decision

the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A.    Background

Plaintiff was 45 years old on her alleged disability onset date of June 1, 2007 and 48 years old at the time of the ALJ's decision on December 30, 2009. Plaintiff had an eighth-grade education. She had previously worked as a hotel cleaner, waitress, bartender, candy packer, and fast food cook.

### B.    Medical Evidence

In August, 2007, Plaintiff went to a hospital emergency room with complaints of shortness of breath. She was diagnosed with Chronic Obstructive Pulmonary Disease (COPD) exacerbation and prescribed Albuterol and Prednisone. An attending physician also noted that she had broad-based disc herniation and facet arthrosis at the L4-5 level of her lumbar spine.

On November 27, 2007, consulting physician Dr. James Baumberger performed an internal medicine examination. Plaintiff reported having breathing problems for the previous six months, not sleeping for the previous two to three days, and passing out for no reason. Dr. Baumberger noted that Plaintiff smoked two packs of cigarettes daily for the previous 33 years, but had reduced her smoking to one pack a day at the time of the exam. In addition, he observed that Plaintiff had normal straight leg raising tests, range of motion, gait, sensation, motor strength, fine and gross

finger manipulation, grip strength, and visual acuity. She was able to oppose each finger to her thumb in both hands, get on and off the exam table, heel and toe walk, tandem walk, stand on one leg, and fully squat without difficulty.

Dr. Baumberger reported that Plaintiff had shortness of breath, COPD, emphysema, anxiety attacks, complaints of insomnia, complaints of stress, anxiety, and complaints of blurry vision, although her visual acuity test was "good" on the day he examined her. He opined that Plaintiff should not work around moving machinery and would have difficulty working with temperature or humidity extremes or with exposure to dust, fumes, or gases, but that she had no limitations in bending, squatting, or using her hands, arms, feet, and legs. He also opined that Plaintiff would have difficulty working in stressful situations at that time, and that it would be helpful to assess her psychiatric symptoms.

On December 20, 2007, state agency reviewing physician Dr. Fernando Montoya opined that Plaintiff could perform medium work as defined by the Social Security Administration. He opined that Plaintiff could: occasionally lift up to 50 pounds; frequently lift 25 pounds; stand/walk or sit with normal breaks for six of eight workday hours; occasionally climb ladders, ropes, and scaffolds; frequently perform all other postural movements, and should avoid concentrated exposure to extreme temperatures, fumes, odors, gases, dusts, and hazards.

On January 11, 2008, Plaintiff went to the emergency room with complaints of hand pain and swelling with occasional numbness and was diagnosed with bilateral hand pain. On January 28, 2008, Plaintiff again complained of swelling and pain in her hands and pain in her feet over the previous four months. An attending physician reported that Plaintiff had normal respiratory effort, reflexes, and gait.

On February 10, 2008, Plaintiff was admitted to the hospital after she complained of shortness of breath and muscle pain. She was diagnosed with COPD exacerbation, pneumonia, gastroesophageal reflux disease, and insomnia. Plaintiff was prescribed medication for high blood pressure, a diuretic, and a prednisone taper.

On March 22, 2008, consulting psychologist Dr. James Crowder examined Plaintiff. Plaintiff reported that she graduated from eighth grade, was enrolled in special education classes, never learned how to read, and failed the GED test four times. Plaintiff reported that she could independently tend to routine personal care, did not cook or do housework, and did not drive due to a suspended license. Dr. Crowder observed that Plaintiff showed a high level of generalized anxiety, poor abstract thinking, and an estimated intelligence within the range of mild mental retardation. He also noted Plaintiff had fair judgment, coherent thoughts, fair to good concentration, intact memory, and basic communication and social skills that allowed her to interact with others so that her needs could be met. Dr. Crowder diagnosed Plaintiff with generalized anxiety disorder, gave her an Axis II diagnosis of estimated mild mental retardation, assigned her a GAF score of 65 to 70, and opined that she could manage any funds awarded to her. Dr. Crowder opined that Plaintiff had a slight limitation in her ability to relate to others; no constriction of interest; no restriction on her daily activities based upon her mental impairments; a good ability to understand and remember; ability to carry out simple instructions; and a good ability to respond appropriately to supervisors, co-workers, and work pressures.

On April 2, 2008, Plaintiff saw state agency consulting physician Dr. Harrison and complained of arthritis, occasional vision problems, COPD, and sleeping difficulties. Although Plaintiff claimed to be allergic to light, Dr. Harrison indicated that Plaintiff only had light sensitivity

to bright lights. Plaintiff also informed Dr. Harrison that she voided every 10 minutes, but Dr. Harrison observed that Plaintiff did not have any episodes during her one-hour visit. Dr. Harrison observed that Plaintiff had normal range of motion in her joints, but had a decreased range of motion in her thumb and could not oppose her thumb to her little finger on her right hand. Dr. Harrison also reported that Plaintiff had zero grip strength in her left hand and 1+ grip strength in her right hand. He noted that Plaintiff had dyspnea on exertion and that she was developing more advanced COPD. Dr. Harrison opined Plaintiff could not perform physical labor due to COPD, decreased range of motion in her thumbs, and decreased grip strength.

On April 2, 2008, upon reviewing Plaintiff's medical records, state agency reviewing psychologist Dr. Dennis opined that Plaintiff had moderate limitations in her activities of daily living; social functioning; and concentration, persistence, or pace. Dr. Dennis acknowledged Dr. Crowder's estimation of mild mental retardation, but he found that Plaintiff's work history, functional limitations, treatment records, and Dr. Crowder's finding that Plaintiff had grossly normal intellectual functioning did not seem consistent with mild mental retardation. Dr. Dennis opined that Plaintiff could understand, remember, and carry out simple instructions; could attend to simple tasks for two hours at a time over an eight-hour workday; may require casual supervision; should have casual contact with the public; needed criticism to be given in a non-confrontational manner; would work best with a few familiar co-workers; and should work with gradual, infrequent changes in the work setting.

On April 24, 2008, state agency reviewing physician Dr. Hicks opined after a review of Plaintiff's medical records that Plaintiff could perform light work; could never climb ladders, ropes, or scaffolds; could frequently perform all other postural activities; could perform fingering and

handling at the light work level; and should avoid concentrated exposure to extreme temperatures or humidity, fumes, odors, gases, dusts, and hazards.

On June 19, 2009, Plaintiff went to the emergency room with complaints of back pain. An MRI showed broad-based disc herniation and facet arthrosis at L4-5 with mild canal stenosis and foraminal narrowing in Plaintiff's lower back. On August 9, 2009, Plaintiff returned to the emergency room, and was diagnosed with chronic low back pain and prescribed pain medication and a muscle relaxant.

On August 13, 2009, Plaintiff saw Dr. Oni, an orthopedic surgeon, for her complaints of chronic lower back pain that had gradually worsened in the prior seven months. Plaintiff reported that she could walk one and one-half blocks before she needed to stop and that prolonged standing worsened her pain, but did not affect her legs. Dr. Oni observed that Plaintiff had limited extension and full flexion with mild discomfort in her lower back, negative straight leg raising tests, normal gait, and no muscle atrophy. X-rays taken in his office showed facet joint arthritis at L5-S1 and mild post-menopausal osteoporosis. Dr. Oni diagnosed Plaintiff with degenerative lumbar stenosis at L4-5 with stenosis and neurogenic claudication. On August 20, 2009, Plaintiff returned for a follow-up consultation and Dr. Oni also diagnosed her with degenerative lumbosacral disease at L3-4 and L4-5, with bulging discs at L4-5 with severe low back pain.

On September 2, 2009, the lumbar myelogram and CT ordered by Dr. Oni showed mild facet joint arthropathy at L5-S1 and broad-based disc bulges at L4-5 and L5-S1 with no nerve root compression, significant stenosis, or significant abnormalities. On September 21, 2009, Dr. Oni indicated that Plaintiff was a candidate for lumbar decompression and fusion surgery, but would have to completely stop smoking in order to undergo the surgery. He instructed Plaintiff to call his

office when she completely stopped smoking for two weeks.

On October 16, 2009, at an appointment with Dr. Yoon, Plaintiff reported her back pain was 9 in severity out of a possible rating of 10; that her legs sometimes gave out and caused her to fall; that Voltaren gel helped reduce some of her arm and leg pain; that she did not notice a difference on Zoloft; and that Xanax and Vicodin were working "fine." Plaintiff also complained of not being able to hold her urine indicating that she urinated on herself up to seven times during sleep and unexpectedly during the day. Dr. Yoon observed that Plaintiff had loss of lordosis; decreased strength; a mild spasm; a mildly reduced range of motion in her neck; and decreased back strength with moderate to severely decreased range of motion, but normal gait, sensation, and reflexes. He diagnosed her with degenerative disc disease, anxiety syndrome and symptoms, chemical (nicotine) dependency, chronic pain syndrome, diabetes mellitus, hypertension, and lumbar radiculitis. He refilled Plaintiff's medications and prescribed Ambien for her insomnia.

On November 9, 2009, Dr. Oni reported that Plaintiff had stopped smoking and referred her for a urinalysis test for nicotine. Dr. Oni indicated that he would see Plaintiff again in three weeks at the arrival of the test results.

On November 23, 2009, Plaintiff was admitted to Community Hospital with complaints of abdominal pain for the previous five days. Dr. Parvez noted that Plaintiff had hypertension and COPD, and that she smoked one pack of cigarettes daily. Dr. Parvez observed that Plaintiff had abdominal and epigastric tenderness. Dr. Parvez admitted Plaintiff for a surgical consultation. The consulting physicians' impressions were abdominal pain. In addition, the consulting physicians suspected possible pancreatitis, gastritis, peptic ulcers, and/or gall bladder disease. They recommended against any surgery and ordered several tests. Plaintiff had a normal chest X-ray.

CT scans of Plaintiff's abdomen showed mild colon diverticulitis, but no acute diverticulitis; fatty infiltration of her liver; a nonspecific adrenal mass; and gastric wall thickening possibly related to gastritis. An abdominal ultrasound was normal. An endoscopy showed stomach ulcers and fluid suggestive of a severely inflamed esophagus.

A December 9, 2009 bone density analysis ordered by Dr. Parvez showed severe osteoporosis at the L1 through L4 levels. Consulting physician Dr. Mary Nicholson opined that Plaintiff was at an "extremely high risk for fracture" due to her osteoporosis.

**C.   Plaintiff's Testimony**

On December 30, 2009, at the Administrative Hearing, Plaintiff testified that she had underarm pain, abdominal pain, and constant back pain that radiated into her legs. She indicated that she had been prescribed pain medication. Plaintiff stated that back surgery was recommended, but had not been scheduled because she first had to quit smoking. Plaintiff hoped to have the surgery scheduled in one month and had gradually decreased her smoking to two cigarettes daily, down from her previous three packs daily.

Plaintiff indicated that she sometimes became dizzy and her right leg gave out; sometimes felt numbness and tingling from diabetes; had weekly swelling in her hands; had difficulty sleeping; and had trouble breathing, which her two prescribed inhalers did not help. Plaintiff indicated that beginning approximately six months earlier, she had frequent urinary urgency; urinated herself several times a night during her sleep; and urinated herself during the day. She stated that she could not go into a store without wetting herself.

Plaintiff testified that she could walk for up to 10 minutes at a time; stand for up to 20

minutes at a time; and sit for up to 15 minutes at a time. Plaintiff stated that she could not bend, stoop, or squat because it increased the pain, but that she did bend to do laundry and pick up objects. She indicated that she could lift a light laundry basket, but not a gallon of milk. Plaintiff testified that her primary care doctor recently told her not to bend or lift. She stated that she spent most days watching television and laying, crawling, or pacing on the floor, but could tend to her personal care. Plaintiff indicated that she had no energy to do household chores.

Plaintiff testified that she had anxiety for the last two years and saw a psychiatrist. She had been prescribed Zoloft. She stated that she did not like to be around people and had memory problems. Plaintiff also indicated that she had taken special education classes; could not read, but could write her name and add and subtract; and failed the GED exam four times.

## D. Vocational Expert Testimony

The ALJ asked the VE what unskilled light work was available in the national economy for an individual of Plaintiff's age, education, and vocational background who could understand, remember, and carry out simple, routine, repetitive work in an environment free of fast-paced production requirements; had a good ability to interact with supervisors, but never interact with coworkers or the public; could never climb ladders, ropes, or scaffolds; could frequently crouch, kneel, crawl, balance, stoop, handle, finger, and climb ramps and stairs, and must avoid exposure to extreme heat, cold, humidity, fumes, odors, dust, gases, poor ventilation, and hazards. The VE testified that such a person could perform the representative light jobs of office helper (6,000 regional jobs, defined as the Northwestern Indiana and Chicago area), inspector (900 regional jobs), and cashier (20,000 regional jobs).

## E. The ALJ's Decision

The ALJ determined that Plaintiff had the following severe impairments: COPD, degenerative disc disease, high blood pressure, illiteracy, generalized anxiety disorder, and estimated mild mental retardation, which did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found moderate restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration persistence or pace, and no episodes of decompensation. However, the ALJ concluded that Ms. Hunt did not meet Listing 12.05 for mental retardation because: (1) she did not have a marked restriction or one marked limitation and repeated episodes of decompensation, each of extended duration, (2) she was "independent as to her personal needs," and (3) she did not have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." The ALJ noted that Dr. Crowder, the state agency psychologist, found Plaintiff's "intellectual functioning . . . within the range of mild mental retardation."

The ALJ found that Plaintiff had the residual functional capacity to perform light work and could frequently climb ramps or stairs, but never ladders, ropes, or scaffolds. The ALJ further determined that Plaintiff could frequently balance, stoop, kneel, crouch, and crawl; frequently handle and finger; should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation and hazards; could understand, remember and carry out simple, routine and repetitive instructions in an environment free of fast paced production requirements; and could interact normally with supervisors, co-workers and the public. The ALJ stated that although Plaintiff's diagnostic tests "show some abnormalities, overall the findings are mild in nature."

The ALJ determined that Plaintiff's medical impairments could cause her alleged symptoms,

but found her statements as to the limitations of the impairments only partially credible.  The ALJ premised her credibility findings primarily on two factors: (1) Plaintiff continued smoking despite the fact that back surgery could not be performed until she quit and (2) Plaintiff completed a questionnaire regarding activities of daily living although she had previously testified she could only read and write her name.  Relying on the vocational expert's testimony, the ALJ found that Plaintiff could perform the requirements of representative occupations such as office helper, inspector, and cashier.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning

of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to h[er] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the

RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).

The claimant bears the burden of proving steps one through four, whereas the burden at step five is

on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th

Cir. 1995).

## DISCUSSION

Plaintiff argues that the ALJ erred in finding Plaintiff did not have a mental impairment that

met Listing 12.05, impermissibly assessed Plaintiff's RFC, and improperly evaluated Plaintiff's

credibility. The Commissioner argues that the ALJ's decision was appropriate and supported by

substantial evidence. The Court will consider each of Plaintiff's arguments in turn.

### A.       Mental Impairment, Listing 12.05

Plaintiff argues that the ALJ erred by finding she did not meet Social Security Listing 12.05

and by not ordering an IQ examination to determine if she met the listing. The Commissioner

contends there was substantial evidence to support the ALJ's finding because Plaintiff failed to meet

her burden of proving she met or medically equaled Listing 12.05.

The determination of whether a claimant suffers from a listed impairment comes at steps two

and three of the ALJ's analysis. Step two of the ALJ's analysis requires an examination of whether

the claimant has an impairment or combination of impairments that are severe. *See* 20 C.F.R. §

404.1520(a)(4)(ii). A medically determinable impairment or combination of impairments is severe

if it significantly limits an individual's physical or mental ability to do basic work activities. *See*

20 C.F.R. § 404.1520(c). The determination of whether a claimant suffers from a severe condition

that meets a listed impairment comes at step three of the sequential analysis. At step three, the ALJ

must determine whether the claimant's impairments meet an impairment listed in the appendix to

the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4)(iii). An individual suffering from

an impairment that meets the description of a listing or its equivalent is conclusively presumed to

be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). In order "[f]or a claimant to show

that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan*

*v. Zebley*, 493 U.S. 521, 530 (1990). An impairment that manifests only some of the criteria will

not qualify, no matter its severity. *Id.*

> Listing 12.05 describes mental retardation and provides, in part:

>> Mental retardation refers to significantly subaverage general
>> intellectual functions with deficits in adaptive functions initially
>> manifested during the developmental period; i.e., the evidence
>> demonstrates or supports onset of the impairment before age 22.

>> The required level of severity for this disorder is met when the
>> requirements in A, B, C, or D are satisfied. . . .

>> B. A valid verbal, performance, or full scale IQ of 59 or less;

>> OR

>> C. A valid verbal, performance, or full scale IQ of 60 through 70 and
>> a physical or other mental impairment imposing an additional and
>> significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. In order "[t]o meet or equal a listed impairment, the

claimant must satisfy all of the criteria of the listed impairment" and she "bears the burden of

proving h[er] condition meets or equals a listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380

(*citing Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993); *Anderson v. Sullivan*, 925 F.2d 220, 223

(7th Cir. 1991); *Steward v. Bowen*, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988)). In this case, the ALJ

found that Plaintiff had not met either the paragraph B or C criteria because there was no IQ score

in the record.

Plaintiff contends that the ALJ erred in concluding that she did not meet the requirements of Listing 12.05 because Dr. Crowder, a consulting psychologist, diagnosed Plaintiff with "estimated mild mental retardation." Plaintiff argues that Dr. Crowder's diagnosis of mild mental retardation indicates that Plaintiff has an IQ of 50-70, which would meet 12.05(B) or (C). *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 41-42 (4th ed. 2000). As the Commissioner argues, an individual who has an IQ between 50 and 70 may be diagnosed as mildly mentally retarded, but a person diagnosed with mild mental retardation does not necessarily have an IQ score between 50 and 70. *Id.* An individual with deficits in adaptive behavior and an IQ up to 75 can also be classified as mildly mentally retarded. *Id.* Accordingly, a diagnosis of mild mental retardation does not automatically establish that a claimant has an IQ score between 50-70 nor that she meets the requirements of Listing 12.05.

Furthermore, "[an] impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, [a plaintiff] must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C. F. R. § 404.1525(d); *see also Maggard*, 167 F.3d at 380. In addition, "standardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of 12.05A." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(b). There is no record of any IQ test in this case. Accordingly, Plaintiff has not met her burden of showing that her mental impairment meets or equals the criteria for mental retardation, and the ALJ's conclusions on this issue will not be disturbed.

## B.    Credibility Finding

Plaintiff argues that the ALJ made an impermissibly cursory credibility finding and drew impermissible inferences regarding Plaintiff's credibility. The Commissioner asserts the ALJ's

finding was supported by substantial evidence.

In making a disability determination, the Commissioner will consider a claimant's statement about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. The Regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p states that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).

An ALJ is not required to give full credit to every statement of pain made by the claimant

or to find a disability each time a claimant states he or she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Plaintiff argues that the ALJ's finding that her statements "are not credible to the extent that they are inconsistent with the residual capacity assessment" is an impermissibly conclusory cart-before-the-horse finding. *See Brown v. Astrue*, No. 09-cv-249, 2010 WL 1727864, at *2 (S.D. Ill. April 27, 2010). Plaintiff argues that the ALJ's finding that Plaintiff's statements "are not credible to the extent they are inconsistent with the above residual functional capacity" impermissibly relied on boilerplate language instead of thorough analysis. The Commissioner argues that the ALJ properly evaluated Plaintiff's credibility in light of the medical evidence.

If the sentence cited by Plaintiff encompassed the totality of the credibility finding in the ALJ's decision, it might indeed be improper. However, the ALJ's opinion reflects that she considered a number of factors before concluding that Plaintiff was less than credible, including Plaintiff's decision to forego surgery on her back and continue to smoke and the results of physical examinations. As the Commissioner argues, the ALJ's credibility determination was not impermissibly conclusory.

Plaintiff also argues that the ALJ drew impermissible inferences in reaching her credibility determination. First, Plaintiff contends that the ALJ erred in finding Plaintiff less than credible

because she smokes. The Commissioner argues that the record supports the ALJ's finding that Plaintiff's continuing to smoke and therefore to forego back surgery indicated that her back pain might not have been as severe as she claimed. Plaintiff's orthopedic surgeon informed Plaintiff that she would have to quit smoking for two weeks before he would schedule the recommended back surgery. Plaintiff argues that there was no evidence that she had not stopped smoking for the recommended two weeks, and the ALJ's finding was therefore based on an improper inference. In addition, argues Plaintiff, it was improper for the ALJ to construct a link between smoking and back pain.

Although an ALJ's credibility determination is entitled to substantial deference, it is impermissible to make an "apparently post-hoc statement [that] turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not." *Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). There must be a link between the medical evidence concerning a plaintiff's condition and her smoking habits before the ALJ can use smoking habits to find that she is less than credible. *Rousey v. Heckler*, 771 F.2d 1065, 1069-70 (7th Cir. 1985). Furthermore, even when there is evidence that links a plaintiff's condition to her smoking habits, "it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).

In this case, progress notes from Plaintiff's orthopedic surgeon indicate that Plaintiff reported on November 9, 2009, that she had not smoked for the previous two weeks and that the surgeon would evaluate her for treatment upon receiving the results of urinalysis testing about three weeks later. On December 30, 2009, at the Administrative Hearing, Plaintiff testified that she needed to

quit smoking before she could undergo the recommended surgery. Accordingly, it was not improper for the ALJ to infer that Plaintiff had not stopped smoking as recommended.

However, it was improper for the ALJ to find that Plaintiff's smoking indicated that her back pain was not severe. Even people with disorders caused by smoking may "continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination." *Shramek*, 226 F.3d at 813. Accordingly, remand is appropriate

Plaintiff also contends that the ALJ erred by improperly discrediting Plaintiff's testimony regarding her illiteracy and by inconsistently finding both that Plaintiff's illiteracy was a severe impairment and that her testimony regarding illiteracy was not credible. The Commissioner contends the ALJ reasonably considered the evidence in discrediting Plaintiff's illiteracy testimony.

If the ALJ's decision is materially inconsistent, a remand may be necessary. *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996). In this case, the ALJ found that Plaintiff's illiteracy was a severe impairment at step two of the analysis, but concluded that her testimony about her illiteracy was only partially credible. Plaintiff argues that this is a material inconsistency requiring remand. The Commissioner argues that the ALJ merely found that the extent to which Plaintiff's illiteracy affected her ability to work was not as significant as testified, a conclusion not inconsistent with a finding that the illiteracy was still severe.

Plaintiff testified that she could not read and could only write her name, but was able to legibly write multiple words in response to questions on the disability questionnaire. Although not all of her answers were entirely clear, they reflected an ability to read and write greater than that to which Plaintiff testified. Accordingly, the ALJ's credibility finding with respect to Plaintiff's

illiteracy is supported by substantial evidence and shall not be disturbed.

The Court remands this matter for further consideration of Plaintiff's credibility, particularly with regard to the pain she experiences, and is directed not to discount Plaintiff's pain due to smoking.

## C.     Residual Functional Capacity Assessment

Plaintiff argues that the ALJ's RFC assessment is insufficient as a matter of law because the ALJ did not provide a logical bridge between the evidence and the limitations in the RFC and did not properly weigh or resolve the inconsistencies between the multiple physicians' reports. Plaintiff also argues that several of Plaintiff's limitations were not included in the RFC, including her issues with frequent urination, hand limitations, mild retardation, social restrictions and illiteracy. The Commissioner asserts that substantial evidence supports the ALJ's RFC finding and that the ALJ reasonably considered the evidence.

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at Steps Four and Five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. In arriving at a RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p at *5. In addition, she "must consider limitations and restrictions imposed by all of an individual's

impairments, even those that are not 'severe'" because they "may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*.

Plaintiff argues that the ALJ demonstrated several inconsistencies in weighing physician opinions. In particular, the ALJ purported to give great weight to Dr. Baumberger, a state agency doctor who performed a consultative examination, concluding that his "opinions were well supported and consistent with the overall medical evidence." However, there were several limitations that Dr. Baumberger found that the ALJ did not include in the RFC. Plaintiff argues that the ALJ did not properly explain her decision to omit these limitations. The Commissioner argues that the ALJ reasonably relied on the opinion of other physicians in the RFC assessment.

The ALJ's duty is to resolve inconsistencies in the evidence. *See* SSR 96-8p. The ALJ's failure to resolve inconsistencies results in a failure to build a logical bridge and renders a "RFC finding [that] [is] fatally flawed because of these omissions by the ALJ." *Barnhart*, 134 F. App'x 81, 83 (7th Cir.2005). The ALJ must resolve the differences and why she accepted one opinion over another to complete her analysis. *See Corder v. Massanari*, No. 00 C 2714, 2001 WL 1355986, at *4 (N.D. Ill. Nov. 1, 2001) ("By failing to resolve conflicts in competing opinions...the ALJ left his conclusions seeking a factual basis."). When there are inconsistent medical opinions in a claimant's case record, the SSA "will weigh all of the evidence and see whether [it] can decide whether [claimant is] disabled based on the evidence" the SSA has. 20 C.F.R. § 404.1527. The SSA gives "more weight" to medical opinions in which the source provides a better explanation for that opinion, or in which the opinion is more consistent with the record as a whole. *Id.* at §§ 404.1527(d)(3)-(4). In addition, the Code directs ALJs to "give more weight to the opinion of a source who has examined [claimant] than to the opinion of a source who has not." 20 C.F.R. §

404.1527(d)(1); *see also Burton v. Apfel*, 1999 WL 46902, at *8 (N.D. Ill. 1999) (finding error in failure to afford "great deference" to the opinion of the only examining psychologist).

Plaintiff argues that the ALJ did not resolve the inconsistencies between the opinions of Dr. Baumberger and Dr. Hicks regarding exposure to pulmonary irritants. The Commissioner argues that because the ALJ adopted Dr. Hicks' recommendations, she did not need to address the inconsistencies between the two. In this case, the ALJ concluded that Plaintiff should avoid concentrated exposure to pulmonary irritants, relying on the conclusion of state agency medical consultant Dr. Hicks, who did not examine Plaintiff. Dr. Baumberger, an examining physician, opined that Plaintiff would have difficulty working in an environment with any exposure to pulmonary irritants. The ALJ did not explain why she accepted Dr. Hicks' opinion over Dr. Baumberger's regarding exposure to pulmonary irritants. There could be a significant difference between a limitation of no exposure to irritants and a limitation of avoiding only concentrated exposure, but the ALJ does not even mention the inconsistency. The ALJ gave more weight to the opinion of the non-examining professional rather than to the examining physician, without explaining the reasons behind this determination.

Similarly, Plaintiff argues that the ALJ also adopted Dr. Hicks' opinion with regard to stress in the workplace, again without explaining why she relied on his and discounted Dr. Baumberger's opinion. The ALJ did not address whether stressors would affect Plaintiff's ability to sustain light work, despite Dr. Baumberger's opinion that Plaintiff might have difficulty working in stressful situations or when encountering stressors. The Commissioner argues that the ALJ was entitled to ignore Dr. Baumberger's opinion on this issue because he was not a mental health professional and she chose to rely on the opinion of Dr. Hicks instead. However, the ALJ did not describe this

reasoning in her decision. As above, the ALJ has failed to provide "an accurate and logical bridge" that allows the Court to understand the reasons she omitted the limitation on stressors, included in the physician opinion she purported to rely upon, from the RFC. Remand is appropriate.

Next, Plaintiff argues that the ALJ omitted several of Plaintiff's limitations from the RFC. Plaintiff argues that the ALJ erred by not including Plaintiff's hand limitation, as described by disability consultative medical examiner Dr. Harrison. The Commissioner argues that the ALJ reasonably rejected Plaintiff's diagnosed hand limitation because Dr. Harrison's opinion lacked support. Dr. Harrison opined that Plaintiff had a decreased active range of motion in her thumbs with decreased grip strength, which he concluded made her incapable of performing any physical labor. The ALJ explained that she gave little weight to Dr. Harrison's opinion because Dr. Harrison's examination notes provided no explanation as to why Plaintiff's grip strength decreased in the four months after Dr. Baumberger's examination, and chose to rely on the earlier test. Although in this instance the ALJ did recognize the inconsistencies between the two opinions, the Court is concerned that she disregarded the opinion showing the greater limitation on the basis of that difference, despite the fact that the opinion reflecting a greater limitation was the most recent. The ALJ did not obtain any medical testimony or otherwise seek to determine what could have caused the decrease in hand strength, but merely disregarded the diagnosis. On remand, the ALJ is directed to address Plaintiff's grip strength and, if necessary, order new tests to demonstrate her current capacity or consult with a medical expert to explain the difference in the grip test results.

Plaintiff also argues that the ALJ failed to address limitations caused by frequent urination. The Commissioner argues that the ALJ did consider Plaintiff's alleged frequent urination, but relied on Dr. Harrison's notations regarding observed frequencies to decline to include any restrictions in

the RFC based on frequent urination. Although the ALJ may be warranted in concluding that Plaintiff's need to urinate may not occur as frequently as she claims, the record contains numerous reports of Plaintiff's urination problems and it was improper for the ALJ to dismiss or ignore all of these references on the basis of a single physician's notations. On remand, the ALJ is directed to address Plaintiff's reported frequent urination, including ordering medical tests to examine the actual severity or consulting a medical expert, if necessary.

Plaintiff also argues that the ALJ failed to address limitations caused by difficulties in social functioning. Plaintiff argues that the ALJ's finding on social functioning was inconsistent because she found moderate limitations in social functioning at step 2 of her analysis but did not include any limitations in Plaintiff's interactions with supervisors, co-workers, or the public in the RFC. The Commissioner argues that the ALJ properly relied on the opinion of Dr. Crowder, the psychological consultative examiner, and explained the weight she gave to Dr. Crowder's opinion and how she reached her conclusion that the evidence did not support the more restrictive opinion. However, the ALJ did not explain the reasoning behind her conclusion that Plaintiff is moderately limited in social functioning but that those limitations would not have any influence on her ability to interact with supervisors, co-workers, or the public. Accordingly, remand is appropriate.

Plaintiff also argues that the ALJ did not explain how the objective medical evidence supported her RFC finding, and that the ALJ "cherry picked" evidence to conclude her ailments of disc herniation, osteoporosis, and stenosis were mild. The Commissioner contends there was substantial evidence to support the RFC finding. Plaintiff argues that the ALJ improperly characterized the results of some of Plaintiff's medical exams as "mild" and that for other exams, even a "mild" result did not necessarily mean that the impairment was not severe. For example,

"mild stenosis" could still cause pain and numbness, and impair bladder functioning. Accordingly, Plaintiff argues, characterizing her overall condition as "mild" is inconsistent with the record. Commissioner argues that the objective medical tests demonstrate largely normal or mild results, justifying the ALJ's finding. On remand, the ALJ is directed to build a logical bridge between the test results and the RFC, explaining her reasoning. In particular, the ALJ is directed to describe the actual limitations, if any, that could result from a "mild" test result, obtaining the opinion of a medical expert if necessary.

Plaintiff also argues that portions of Dr. Baumberger's opinion was also afforded more weight that was appropriate. Plaintiff argues that Dr. Baumberger did not assess Plaintiff's ability to sit, stand, walk, lift, and carry, so it was improper for the ALJ to rely on his opinion to conclude that Plaintiff could perform light work, particularly given the presence in the record of Dr. Montoya's analysis. Dr. Montoya, a state agency physician, did assess Plaintiff's ability to sit, stand, walk, lift, and carry. Accordingly, argues Plaintiff, the ALJ should have afforded more weight to Dr. Montoya's conclusions than to Dr. Baumberger's. The Commissioner argues that the ALJ did not rely on Dr. Baumberger's assessment, but instead adopted the more recent limitations described by Dr. Hicks, another state agency medical consultant. The fact that it is unclear from the ALJ's decision which medical opinion or opinions she relied upon to reach her conclusion that Plaintiff can perform light work indicates that her reasoning was insufficiently explained.

On remand, the ALJ is directed to build a logical bridge between the medical evidence and the RFC, thoroughly explaining her reasoning and resolving any inconsistencies in the record. If "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision," the ALJ may order a consultative examination to develop the record and resolve any conflict or

ambiguities.  20 C.F.R. § 416.919(b).

**D.    Vocational Expert Testimony**

Plaintiff argues that the ALJ failed to include all of Plaintiff's limitations in the hypothetical questions posed to the VE.  In particular, the ALJ did not question the VE regarding the limitations on jobs caused by a hearing impairment or foot impairment and didn't ask the VE about concentration, persistence, and pace.

When an ALJ relies on testimony from a VE to make a disability determination, the ALJ must incorporate all of the claimant's limitations supported by medical evidence in the record.  *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *see also Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) ("Furthermore, to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers.") (citation omitted).  If the VE is unaware of all of the Plaintiff's limitations, he may refer to jobs the Plaintiff cannot perform.  *Kasarsky*, 335 F.3d at 543.  In addition, the ALJ must make certain the jobs the VE identifies are consistent with  Plaintiff's DOT reasoning level. *Prochaska*, 454 F.3d at 735.

Because the case is being remanded for other reasons described above, new VE testimony will need to be obtained based on appropriate disability and RFC findings.  The ALJ is cautioned that she must incorporate all relevant limitations in her questioning of the VE.

**E.    Remedy**

Finally, Plaintiff requests that the Court reverse the Commissioner's decision and remand  for an award of benefits.  An award of benefits is appropriate "only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe*, 425 F.3d at 356.  Here, the ALJ's

opinion was not supported by substantial evidence because she failed to develop the record, leaving several issues unresolved. Further, although Plaintiff requests an award of benefits, she fails to present a developed argument in favor of doing so.

The ALJ must address the Plaintiff's credibility, including the amount of pain she is in, and resolve inconsistencies in the medical record. These are issues that can only be resolved through further proceedings on remand. Accordingly, this matter is remanded for further proceedings.

## CONCLUSION

The Court finds that the ALJ failed to sufficiently articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning. *See, e.g., Scott*, 297 F.3d at 595. An ALJ must give enough information for the reviewing court to consider her reasoning and be assured that all of the important evidence was properly considered. In this case, the ALJ made an improper credibility determination and failed to resolve omissions and inconsistencies related to medical opinions considered in her RFC finding. Therefore, to this extent the Court **GRANTS** the Plaintiff's Memorandum in Support of Her Motion for Summary Judgment or Remand [DE 18] and **REMANDS** this matter for further proceedings consistent with this opinion. However, the Court **DENIES** Plaintiff's request to award benefits.

SO ORDERED this 8th day of September, 2011.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record